**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens

*Special Litigation Counsel to Richard E.*
  *O'Connell, Chapter 7 Trustee*

**Hearing Date: July 21, 2015**
**Hearing Time: 2:00 p.m. (EST)**

**Objection Deadline:  July 14, 2015**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                     :
                                       :       Chapter 7
HERMAN SEGAL,                   :
                                       :       Case No. 13-45519 (NHL)
                 Debtor.        :
----------------------------------------------------------------x

**TRUSTEE'S MOTION FOR AN ORDER, PURSUANT TO 11 U.S.C. §§
105(a) AND 542(a), FED. R. BANKR. P. 2004 AND FED. R. CIV. P. 45(d)(2)
AND (e): (I) COMPELLING VICTORIA PRESTINO AND RODERICK
REYES TO COMPLY WITH THE TRUSTEE'S SUBPOENAS; (II)
COMPELLING VICTORIA PRESTINO AND RODERICK REYES TO
TURN OVER THE PROPERTY KNOWN AS 2179 EAST 33RD STREET,
BROOKLYN, NEW YORK, TO THE TRUSTEE; AND (III) HOLDING
VICTORIA PRESTINO, RODERICK REYES AND HERMAN SEGAL IN
CONTEMPT OF THIS COURT'S ORDER, DATED FEBRUARY 8, 2015
AT DOCKET NUMBER 176, AND PUNISHING SUCH CONTEMPT
<u>WITH APPROPRIATE SANCTIONS</u>**

**TO THE HONORABLE NANCY HERSHEY LORD,**
**UNITED STATES BANKRUPTCY JUDGE:**

      Richard E. O'Connell, the Chapter 7 Trustee (the "<u>Trustee</u>") for the estate of Herman

Segal (the "<u>Debtor</u>"), by and through his special litigation counsel, Klestadt Winters Jureller

Southard & Stevens, LLP, as and for his motion (the "<u>Motion</u>") for an order, pursuant to sections

105(a) and 542(a) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2004

and 9016 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules

45(d)(2) and (e) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), (I) compelling

Victoria Prestino ("Prestino") and Roderick Reyes, a/k/a Ronald Reyes ("Reyes") (collectively, the "Occupants") to comply with the Trustee's subpoenas issued pursuant to Bankruptcy Rule 2004 (collectively, the "Subpoenas"), copies of which are annexed hereto as Exhibit A, (II) compelling the Occupants to turn over the property known as 2179 East 33rd Street, Brooklyn, New York (the "Property") to the Trustee, and (III) holding the Occupants and Debtor in contempt of this Court's Order, dated February 8, 2015 [Docket No. 176] (the "Sale Order"), authorizing and directing Eagle Park Holding, LLC ("Eagle Park") to market and sell the Property for the benefit of the Debtor's estate, a copy of which is annexed hereto as Exhibit B, and punishing such contempt with appropriate sanctions; respectfully represents:

## PRELIMINARY STATEMENT

1.      The Occupants and Debtor are testing this Court to see just how much contemptuous behavior this Court will tolerate.  As this Court is well aware, after numerous hearings, this Court entered the Sale Order on February 8, 2015 mandating the sale of the Property. The Sale Order is now final and unassailable.  The Sale Order was entered on notice to the Debtor (who appeared at all hearings where the Sale Order was considered) and to the Occupants.  The Sale Order found and directed, for good reason and just cause, among other things, that:

- Eagle Park holds good and marketable title to the Property (Sale Order, ¶3);

- Elliot Galpern ("Galpern") owns one-hundred (100%) percent of the interest in Eagle Park (the "Membership Interest") (Id.);

- Eagle Park will cooperate in all ways with the sale of the Property at the Trustee's direction and will execute any and all documents as are reasonably necessary or required by the Trustee to effectuate the transfer of title to the Property (Id. at ¶6);

- The Trustee is entitled to all the net proceeds (the "Net Proceeds") from the sale of the Property. . . . for the benefit of the Debtor's estate, free and clear of any liens, claims or encumbrances (Id. at ¶8); and

- Any and all claims against any third parties in connection with [the Property] shall be the sole and exclusive property of the Trustee and the Debtor's bankruptcy estate including, but not necessarily limited to: (i) claims against the [O]ccupants of the Property for rent incurred during the period of occupancy; (ii) claims for damage caused to the Property; (iii) claims against the Debtor or other for failure to pay [Property related expenses]; (iv) claims against the Debtor or others for collecting and retaining rent or other charges from subtenants without paying rent and other charges due Eagle Park. . . . . (Id. at ¶9).

2.      The Occupants continue to occupy the Property as squatters without paying rent. Since the entry of the Sale Order, Eagle Park has continued with its efforts to evict the Occupants in landlord and tenant court ("L&T Court") and sell the Property as mandated by the Sale Order. The Property has been listed with Century 21 as required under the terms of the Sale Order and the Trustee and Eagle Park have received offers, each of which is contingent upon an inspection of the interior of the Property, which is impossible because the Occupants continue in unlawful possession.  Each day that the Occupants remain in possession, the Property cannot be sold and the Debtor's estate incurs more interest and charges to Eagle Park pursuant to the terms of the Sale Order.

3.      The Occupants and the Debtor (the Debtor's relationship to the Occupants remains a complete mystery to the Trustee) have done everything possible to frustrate the Trustee's and Eagle Park's efforts to consummate the terms of the Sale Order.  Among other things, the Occupants have appeared and sought adjournments and delays in L&T Court numerous times, the Debtor apparently acting as the Occupants' de facto counsel.  Finally, on June 29, 2015, the Occupants commenced an adversary proceeding (No. 15-1076) (the "Adversary Proceeding") by filing a complaint (the "Complaint") in this Court against the Trustee and Eagle Park setting forth a painfully convoluted theory of the case that defies reason and is completely at odds with this Court's Sale Order.

4.      The Occupants have no right to occupy the Property and they do so in direct

violation of the terms of this Court's Sale Order.  This Court should enforce its Sale Order and compel the Occupants' immediate vacatur of the Property and payment of rent to the estate for all the time that they have squatted there and lived rent free at the expense of the Debtor's defrauded creditors (since in or around February 2014).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Administrative Order No. 264 titled "In the Matter of The Referral of Matters to the Bankruptcy Judges" of the United States District Court for the Eastern District of New York (Weinstein, C.J.), dated August 28, 1986, and Administrative Order No. 601 of the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Venue of this proceeding and this application is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicate for the relief requested herein is sections 105(a) and 542(a) of the Bankruptcy Code, Bankruptcy Rules 2004(c) and 9016, and Federal Rules 45(d)(2) and (e), made applicable by Bankruptcy Rule 9016.

## INTRODUCTION

9.      On September 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

10.     On or around the Petition Date, Richard E. O'Connell was appointed interim chapter 7 trustee of the Debtor's estate.  On October 15, 2013, the Trustee presided over the first meeting of creditors in the Debtor's case and became the permanent trustee herein by operation of section 702(d) of the Bankruptcy Code.

11.    On September 20, 2013, the Trustee filed an application for authority to retain Yost & O'Connell as his general counsel, which was granted by Order of this Court dated October 18, 2013 [Docket No. 17].

12.    On October 2, 2013, the Trustee employed Klestadt Winters Jureller Southard & Stevens, LLP (f/k/a Klestadt & Winters, LLP), to serve as his special litigation counsel in the Debtor's case, and such retention was approved by Order of this Court dated January 25, 2014 [Docket No. 51].

13.    By order entered January 31, 2015, the Debtor's discharge was denied by this Court upon the Trustee's request [Docket No. 170].

## BACKGROUND

**a. The Property, Membership Interest and Sale Order**

14.    On January 25, 2011, Eagle Park was formed by the filing of a certificate of formation with the New York State Department of State.

15.    On January 25, 2011, Eagle Park acquired the Property from Charisse A. Mobilia as surviving tenant by the entirety of James Mobilia for stated consideration of $366,500.

16.    Upon information and belief, the Debtor entered into a lending transaction with Harry Einhorn ("Einhorn") either at the time Eagle Park acquired the Property or afterward.  In order to provide Einhorn with security for repayment of the loan, the Debtor transferred a one-hundred (100%) percent membership interest in Eagle Park (defined above as the "Membership Interest").

17.    In or around August 15, 2013, the Debtor borrowed $275,000 from Galpern (the "Galpern Loan").  At or around the same time, Einhorn transferred the Membership Interest to Galpern to secure the Debtor's repayment of the loan from Galpern.  A copy of the Membership

Interest transfer document is annexed hereto as <u>Exhibit C</u>.

18.     In connection with the Galpern Loan, Eagle Park and the Debtor entered into the Lease.  The Lease required the payment of rent, which in reality was interest due under the Galpern Loan.  Further, the Lease contained the Purchase Option, which in reality was a balloon payment of the principal under the Galpern Loan.  A copy of the Lease is annexed hereto as <u>Exhibit D</u>.

19.     In or around March 1, 2014, the Debtor stopped paying the rent due under the Lease and Eagle Park commenced a non-payment and eviction proceeding captioned: <u>Eagle Park Holding LLC v. Herman Segal</u>, L&T Index No. 4519/2014 (the "<u>Eviction Action</u>") in Kings County Landlord-Tenant Court (defined above as the L&T Court).

20.     On September 3, 2014, Eagle Park obtained a judgment in the Eviction Action against the Debtor authorizing the eviction of the Debtor and occupants of the Property (the "<u>Eviction Judgment</u>").  When Eagle Park delivered the Eviction Judgment to the marshal for execution, the marshal refused to execute because of the Debtor's bankruptcy case and the existence of the automatic stay.  Until that time, neither Galpern nor Eagle Park had any knowledge of the Debtor's bankruptcy filing.

21.     On October 16, 2014, Eagle Park filed a motion to terminate the automatic stay so that it could proceed with the eviction of the Occupants as contemplated by the Eviction Judgment (the "<u>Lift Stay Motion</u>").  The Trustee filed a preliminary objection with reservation of rights to the Lift Stay Motion (the "<u>Objection</u>") [Docket No. 135].

22.     Galpern, Eagle Park and the Trustee entered into significant, good faith discussions aimed at resolving the issues regarding the Property, Eviction Judgment, Membership Interest, Lift Stay Motion and Objection.  On or around December 3, 2014, the

Trustee entered into two stipulations with Eagle Park. The first stipulation was entered by the Court and approved on February 3, 2015 [Docket No. 171] (the "Lift Stay Order") and authorized Eagle Park to continue with prosecution of the Eviction Action and execution of the Eviction Order. The second stipulation was the Sale Order.

23.    The Sale Order settled and resolved all disputes between the Trustee, Eagle Park and Galpern and, among other things, provided as follows:

- Eagle Park holds good and marketable title to the Property (Sale Order, ¶3);

- Galpern owns one-hundred (100%) percent of the interest in Eagle Park (the "Membership Interest") (Id.);

- Eagle Park will cooperate in all ways with the sale of the Property at the Trustee's direction and will execute any and all documents as are reasonably necessary or required by the Trustee to effectuate the transfer of title to the Property (Id. at ¶6);

- The Trustee is entitled to all the Net Proceeds from the sale of the Property. . . . for the benefit of the Debtor's estate, free and clear of any liens, claims or encumbrances (Id. at ¶8); and

- Any and all claims against any third parties in connection with [the Property] shall be the sole and exclusive property of the Trustee and the Debtor's bankruptcy estate including, but not necessarily limited to: (i) claims against the [O]ccupants of the Property for rent incurred during the period of occupancy; (ii) claims for damage caused to the Property; (iii) claims against the Debtor or other for failure to pay [Property related expenses]; (iv) claims against the Debtor or others for collecting and retaining rent or other charges from subtenants without paying rent and other charges due Eagle Park. . . . . (Id. at ¶9).

24.    Upon motion by the Trustee, the Sale Order was entered on February 8, 2015 and by operation of Bankruptcy Rule 8002(a), became final and unappealable on and after February 22, 2015.

### b. Debtor's and Occupants' Intentional Violations and Interference with the Sale Order

25.    At the time the Sale Order was put before the Court, the Trustee was ignorant of the exact identity of the Occupants. The Debtor intentionally obscured that information from the

Trustee and this Court.  For example, on December 28, 2014, the Debtor told the Court as follows:

> THE COURT:  Mr. Segal, I don't see how th[is] could possibly incriminate you, so let me ask you, are you willing to tell us all who's living there [in the Property] and if they're paying rent?
>
> MR. SEGAL:  I plead the Fifth Amendment, Your Honor.
>
> THE COURT: On that?
>
> MR. SEGAL:  Yes, Your Honor.
>
> THE COURT:  Okay. So you think that answering that could some way or other lead to potential for incriminating you in some criminal way by answering who's living there and whether they're paying you rent?
>
> MR. SEGAL:  Well, apparently Mr. Galperin and his counsel seem to think so.  Who am I to argue with them?
>
> THE COURT: I lost you.

Transcript December 28, 2014 Hearing, pp.66-67.

26.    Regardless, the Trustee carefully and intentionally provided the Occupants with notice of the motion to approve the Sale Order and served the motion, notice of hearing and proposed Sale Order on them as follows:

> Current Occupant
> 2179 East 33rd Street
> Brooklyn, NY 11234

See Affidavit of Service [Docket No. 147], annexed hereto as Exhibit E.

27.    The Occupants never objected to the entry of the Sale Order or sought an appeal therefrom.  This Court granted the Debtor an extension of time to object to the motion for approval of the Sale Order to January 15, 2015, but he failed to do so.  The Debtor did offer the following at the hearing on January 29, 2015 however:

> THE COURT:  January 15th in which to file opposition, you have not filed opposition.  Is that correct?

MR. SEGAL: Your Honor, again, I don't have any problems with wishing to file any objections; however, there are other parties that have interests in these property and who have no notice.

THE COURT:  Did you provide those names to the trustee?

MR. SEGAL:  I did not.

THE COURT:  Are you willing to?

MR. SEGAL:  I don't know, I'd have to think about it.

THE COURT:  No, you said that last time, because I remember you telling me this.  You stood up and said the same thing last time.  So, I can't - - -

MR. SEGAL:  I will provide - - -

THE COURT: - - a lot of peoples' rights are, you know, being held up here.

MR. SEGAL:  I will provide them to the trustee, yes.

Transcript at pp. 53-54.

THE COURT:  Mr. Segal, you did not file an objection.

MR. SEGAL:  I have no grounds to object.

Id. p. 59, LL. 13-15.

28.    Following the January 29, 2015, the Court entered the Sale Order on February 8, 2015.

29.    On February 25, 2015, the Debtor filed an affidavit in the Eviction Action seeking vacatur of the Eviction Judgment (the "Debtor Affidavit").  A copy of the Debtor's affidavit is annexed hereto as Exhibit F.  The Debtor had no right to intervene or interfere in the Eviction Action.  This Court authorized the continuation of the Eviction Action by the Lift Stay Order and the Trustee stands in the shoes of the Debtor with respect to any rights that he may have.

30.    The Trustee was not provided with copy of the Debtor Affidavit until March 31,

2015, when it was sent to his counsel by Eagle Park's counsel in the L&T Action.   Until receiving the Debtor Affidavit, the Trustee did not know the identity of the Occupants because that information had been refused to his Court and the Trustee previously.

31.    On April 30, 2014, the Trustee filed an application for authority to examine the Occupants pursuant to Bankruptcy Rule 2004 [Docket No. 218] (the "2004 Application").   The 2004 Application and notice of hearing thereon was served upon each of the Occupants at the Property by Federal Express overnight delivery.   See Affidavit of Service at Docket No. 220. The Occupants did not respond in any way to the 2004 Application, timely or otherwise.

32.    On or around May 11, 2015, a person identifying himself as Ron, who upon information and belief was Reyes, called the Century 21 broker employed by Eagle Park, Delton Cheng, and informed him that he was a "rep for Eagle Park Holding" and that Century 21 was illegally posting the Property for sale.

33.    On May 14, 2015, a hearing was held in the Eviction Action where the Debtor appeared with Reyes and successfully delayed the Eviction Action.   Following that hearing, the Debtor appeared in this Court for hearings on, among other things, the 2004 Application.   Upon information and belief, Reyes attended the hearing in this Court on May 14, 2015, but did not appear and stayed in the gallery.

34.    At the hearing on the 2004 Application on May 14, 2015, Trustee's counsel reported on what was happening in the Eviction Action and the Court granted the 2004 Application.

35.    On June 5, 2015, the Occupants were served with the Subpoenas together with witness fees.   A gentlemen identifying himself as Chris Riccardi answered the door at the Property and identified himself as a co-tenant and accepted service.   Copies of the Subpoenas

and affidavit of service are annexed hereto as <u>Exhibit A</u>. The Subpoenas required the Occupants to produce responsive documents by June 18, 2015 and appear for examinations on June 25, 2015.  The Occupants have not responded to the Subpoenas in any way, although Trustee's counsel has reached out to and spoken to Reyes about the Subpoenas.  Reyes states on each occasion that he "has to get back to [Trustee's counsel]," but never does so.

36.     On June 29, 2015, the Occupants commenced the Adversary Proceeding on the eve of a continued hearing in the Eviction Action.  The Adversary Proceeding was filed exactly 209 days after the Occupants were served with the motion for approval of the Sale Order, 141 days after this Court entered the Sale Order, 60 days after the Occupants were served with the 2004 Application and notice thereof, 46 days after Reyes attended a hearing in this Court and said absolutely nothing, and 24 days after the Occupants were served with the Subpoenas by process server.

**c.  The New Allegations by the Occupants are Ridiculous**

37.     To begin, the Occupants have sat by and done nothing for well over six months. The Sale Order is final and the Occupants are stuck with it and its findings.  They have no right to occupy the Property and must be compelled to leave.  That said, for the avoidance of doubt, the unsubstantiated story spun by the Occupants in the Complaint defies logic and reason and can be dismissed outright.

38.     In the Complaint, the Occupants claim, without factual or legal support, that the Membership Interest is held by Galpern as collateral and not as the actual owner.  The Occupants provide no documents to support that claim or to contradict the Membership Interest transfer document annexed hereto as <u>Exhibit C</u>, pursuant to which Einhorn transferred the Membership Interest to Galpern.

39.     The Occupants further claim that "[a]t or around the same time" as the Galpern Loan, the Debtor sold the Membership Interest to Dominik Raciliano.    Complaint, ¶16. Interestingly, the Occupants do not explain how the Debtor sold the Membership Interest to Raciliano when Einhorn was the owner of the Membership Interest at the time.    Nor do they provide any support, documentary or otherwise, for this claim.

40.     Then, the Occupants claim that on May 31, 2015, Riciliano sold the Membership Interest to Prestino for $80,000.    Complaint, ¶18.    The Occupants do not explain why Prestino would purchase the Membership Interest long after learning about the Sale Order, 2004 Application and Eviction Action.    Nor do the Occupants provide any documentary or other support for this claim.

41.     Even if the Occupants story were true, they do not explain anywhere in the Complaint how they are going to address the money owed to Galpern.    To top it off, the Occupants also claim that Prestino, as the "owner" of Eagle Park, granted a life estate to Reyes on or around May 31, 2015.

42.     The Occupants are playing games and having a laugh at this Court's, the Trustee's, Galpern's, and most significantly, the Debtor's creditors' great cost and expense.    The Occupants have been and continue to squat in the Property without paying rent and are trying to see just how long they can continue to get away with it.    The Occupants have no right to the Property and no basis for disturbing the Sale Order, which they have known about for a very long time.

### d.  The Bazaar Relationship Between the Occupants and the Debtor

43.     The Debtor's mysterious relationship with Reyes raises even more questions. Reyes has apparently occupied the Property for years without paying rent.    Further, an inspection

of certain of the Debtor's bank statements shows that the Debtor has made transfers to Reyes or on behalf of Reyes since 2009 as follows:

- Transfers from H. Segal Bank of America Account No. *****4512 to Roderick or Ron Reyes:

| | | | | | |
|---|---|---|---|---|---|
| Reyes, Ron | BofA *4512 | 178 | 11/10/2011 | $ | 7,500.00 |
| Reyes, Ron | BofA *4512 | 179 | 11/15/2011 | $ | 5,437.38 |
| Reyes, Ron | BofA *4512 | 156 | 6/22/2012 | $ | 1,500.00 |
| Reyes, Roderick | BofA *4512 | | 9/27/2012 | $ | 9,912.46 |
| Reyes, Roderick | BofA *4512 | 319 | 11/15/2012 | $ | 3,100.00 |
| Reyes, Roderick | BofA *4512 | | 12/17/2012 | $ | 13,500.00 |

- Transfers from H. Segal Signature Bank Account No. *****1078 to Roderick or Ron Reyes:

| | | | | | |
|---|---|---|---|---|---|
| Reyes, Ron | Sig *1078 | 1275 | 9/13/2009 | $ | 7,100.00 |
| Reyes, Ron | Sig *1078 | 1284 | 10/22/2009 | $ | 8,002.00 |
| Reyes, Roderick | Sig *1078 | 1925 | 10/04/2012 | $ | 5,000.00 |

- Transfers from H. Segal Signature Bank Account No. *****1078 to Third Parties attributed to Reyes:

| | | | | | | |
|---|---|---|---|---|---|---|
| Valley National Bank | Sig *1078 | 793 | 06/02/2008 | $ | 4,200.00 | |
| Valley National Bank | Sig *1078 | 883 | 8/10/2008 | $ | 5,000.00 | R. Reyes ****1414 |

44.    Even stranger, a review of Yocheved Segal's (the Debtor's spouse) bank statements reveals that in January of 2015, Ms. Segal transferred $7,144 to American Express on account of Reyes.

45.    The Subpoenas were aimed at better understanding this strange relationship and why the Debtor transfers money to Reyes, allows him to live for free in the Property and appears for him as his *de facto* (albeit disbarred) counsel in the Eviction Action.

## RELIEF REQUESTED

**a. This Court Should Enforce the Sale Order and Require the Occupants to Turn Over the Property to the Trustee**

46.    This Court has broad discretion and ability to enforce its own orders.  Section 105(a) of the Bankruptcy Code states that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). However, section 105 is not limitless, and thus "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 95–96 (2nd Cir. 2010) (internal quotations and citations omitted). Bankruptcy courts are empowered to utilize their equitable powers under section 105 where appropriate "to facilitate the implementation of other Bankruptcy Code provisions." Id*. (quoting Bessette v. Avco Fin. Servs. Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)).

47.    This Court has inherent power to enforce compliance with its lawful orders through civil contempt. See Spallone v. United States, 493 U.S. 265 (1990); Shillitani v. United States, 384 U.S. 364, 369 (1966).  As the Supreme Court stated in Ex parte Robinson, 86 U.S. 505, 510 (1874), "the power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice." See also 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §2960 (3d ed. 2006) ("A court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots.").

48.    Courts have embraced the inherent contempt authority as a power "necessary to the exercise of all others." Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994) ("Courts independently must be vested with power to impose silence, respect, and

decorum, in their presence, and submission to their lawful mandates, and to preserve themselves and their officers from the approach and insults of pollution."); <u>see</u> <u>also</u> <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764 (1980) (stating that contempt powers are "the most prominent" of court's inherent powers "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court"); <u>Sigety v. Abrams</u>, 632 F.2d 969, 976 (2d Cir. 1980) ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.").

49.    The power to impose civil contempt sanctions applies in this Court as well. Indeed, it is well established that bankruptcy courts have power to enter civil contempt orders. <u>In re MarketXT Holdings Corp.</u>, Case No. 04-12078, 2006 WL 408317, at *1 (Bankr. S.D.N.Y. Jan. 27, 2006) ("It is well accepted, in light of the 2001 amendments to Rule 9020, that bankruptcy courts have power to enter civil contempt orders."); <u>see</u> <u>also</u> <u>In re World Parts, LLC</u>, 291 B.R. 248, 253 (Bankr. W.D.N.Y. 2003) ("Bankruptcy courts possess the power to impose sanctions for acts of civil contempt.") (<u>citing</u> <u>In re Chateaugay Corp.</u>, 920 F.2d 183, 187 (2d Cir. 1990)).

50.    The Sale Order clearly establishes the Trustee's interest in the Sale Property and the Net Proceeds thereof, which are property of the estate pursuant to section 542(a) of the Bankruptcy Code.  The Sale Order has not been timely or properly challenged.  It is a final order of this Court that the Occupants knew about before, during and long after its carefully considered entry by this Court.  This Court is empowered to and should enforce it.

51.    The Occupants, together with the Debtor, are violating the decrees and spirit of both the Sale Order and the Lift Stay Order by squatting in the Property, delaying the Eviction

Action, not informing this Court or the Trustee of relevant information, and now, by commencing the Adversary Proceeding and forcing the Trustee and Galpern to respond to it. Enough is enough.  The Debtor and his cronies having been playing games with this Court and its policies and procedures since this case began in September 2013.  The Debtor has proven time and time again that he will do anything and everything to frustrate the Trustee's efforts to recover money and property for the benefit of the Debtor's victims.  Such conduct should not be tolerated and should be punished so that it does not continue.

52.    The Trustee respectfully submits that this Court should enforce the Sale Order and issue appropriate sanctions for the Occupants and Debtor's contempt thereof in at least the following ways:

a) <u>Turnover the Property</u>.  The Occupants should be compelled to immediately turn over the Property to the Trustee and Eagle Park in broom clean condition and in good order.

b) <u>Payment of Rent</u>.  The Debtor stopped paying rent to Eagle Park under the Lease in or around February 2014.  Pursuant to the Sale Order, the Trustee is compelled to pay rent from the Net Proceeds to Eagle Park.  At the same time, the Occupants have lived in the Property without paying rent.  Rent due under the Lease was $2,750 per month.  Occupants should be required to pay <u>$46,750</u> to the Trustee immediately for rent due from March 2014 to July 2015.

c) <u>Dismissal of Adversary Proceeding</u>.  The Adversary Proceeding should be dismissed immediately with prejudice.  All matters addressed therein are resolved by the Sale Order and this Court's enforcement thereof.

d) <u>Trustee's Costs</u>.    The Occupants should pay the Trustee's costs of their

contemptuous behavior including the costs of brining this motion of not less than $10,000. In the event the Occupants are unable to pay the rent and Trustee's costs required under this Order, Occupants' counsel will be required to pay the Trustee's costs if he cannot provide adequate proof that he tested the Occupants claims and performed sufficient due diligence to ensure they were truthful before filing the Complaint.

53.    The Trustee submits that the forgoing sanctions are reasonably and appropriate under the circumstances. They are designed to put the estate into the position it was in before the Occupants (with the Debtor's help) intentionally damaged the estate and defied this Court's Sale Order.

**b. The Occupants Should be Compelled to Comply with the Subpoenas**

54.    The Subpoenas were issued pursuant to this Court's order. The Occupants received timely notice of the 2004 Application and never responded to it in any way. The Subpoenas were served along with witness fees by hand as required. The Occupants never timely made any motion to quash the Subpoenas or for a protective order. They simply ignored the Subpoenas.

55.    Pursuant to Federal Rule 45(g), made applicable here pursuant to Bankruptcy Rule 9016, this Court "may hold in contempt a person who, having been served, failed without adequate excuse to obey the subpoena or an order related to it."

56.    The Occupants were properly served with the Subpoenas and have provided no excuse for failing to comply. This Court should hold the Occupants in contempt of the 2004 Order and Subpoeans and compel them to comply with the Subpoenas and pay all Trustee's costs associated with this Motion.

## **NOTICE**

57.     Notice of this Motion and hearing thereon has been provided to the Occupants, to the Debtor, and to counsel to all parties to this Adversary Proceeding.  The Trustee submits that such notice of the instant Motion and relief sought herein is appropriate under the circumstances and that no further or additional notice need be given.

## **NO PRIOR RELIEF**

58.     Except as otherwise stated herein, no previous application for the relief sought herein has been made to this or any other court.

*[Continued on next page]*

**WHEREFORE**, the Trustee respectfully requests that this Court enter an order, substantially in the form of the Proposed Order annexed hereto as <u>Exhibit G</u>, and for such other and further relief as the Court determines to be just and proper.

Dated:   New York, New York
         July 3, 2015

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:   */s/ Fred Stevens*
      Fred Stevens
      570 Seventh Ave., 17th Floor
      New York, New York 10018
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: fstevens@klestadt.com

      *Special Counsel to Richard E. O'Connell, the
      Chapter 7 Trustee of the Estate of Herman
      Segal*