**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Christopher J. Reilly

*Special Counsel to Plaintiff Richard E. O'Connell,*
  *Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                          :
                                                               :    Chapter 7
HERMAN SEGAL,                                                   :
                                                               :    Case No. 13-45519 (NHL)
                          Debtor.                              :
------------------------------------------------------------x
RICHARD E. O'CONNELL, as Chapter 7 Trustee    :
of the Estate of Herman Segal,                                 :
                                                               :
                          Plaintiff,                           :
                                                               :
        -against-                                              :    Adv. Pro. No. 15-_____
                                                               :
LARRY GRUNFELD,                                                :
                                                               :
                          Defendant(s).                       :
------------------------------------------------------------x

### TRUSTEE'S COMPLAINT SEEKING: (I) AVOIDANCE OF FRAUDULENT, PREFERENTIAL AND/OR UNAUTHORIZED POST-PETITION TRANSFERS; (II) THE DISALLOWANCE OF ANY AND ALL CLAIMS AGAINST THE DEBTOR'S ESTATE UNLESS AND UNTIL ALL AVOIDABLE TRANSFERS ARE RESTORED; AND (III) RELATED RELIEF

Richard E. O'Connell, as Chapter 7 Trustee (the "Trustee" or "Plaintiff") of the estate of

Herman Segal, the above-captioned debtor (the "Debtor"), by his special litigation counsel,

Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint")

herein against Larry Grunfeld (the "Defendant"), seeking (i) the avoidance of fraudulent,

preferential and/or unauthorized post-petition transfers, (ii) the disallowance of any claims of the Defendant against the Debtor's estate, and (iii) related relief, including the payment of attorneys' fees and costs, alleges as follows:

## PRELIMINARY STATEMENT

The Debtor is a former attorney and holds a *juris doctor* degree from Columbia Law School.  The Debtor was disbarred over twenty years ago following a conviction by a jury on conspiracy charges.  Since the Debtor's release from prison in the early 1990's, he has engaged in a number of businesses including: (i) buying and selling real property; (ii) purchasing, selling, trading and managing life insurance policies on the lives of third parties and related trusts in secondary markets and STOLI (Stranger-Originated Life Insurance) transactions; and (iii) trading stocks and other securities.  Most if not all of the Debtor's businesses originated as, or devolved into, schemes and a constant effort by the Debtor to raise money from new sources to pay creditors and the victims of prior schemes.  Like all such enterprises, the Debtor's eventually came to an end.

During the course of this bankruptcy case, the Debtor has refused to testify or produce documents generally by asserting his rights under the Fifth Amendment of the United States Constitution. When asked for an explanation of his alleged fear of incrimination, the Debtor answers that he is concerned of prosecution possibly for "tax evasion" or "insider trading."  Due to the Debtor's refusal to cooperate or even disclose the identity of his creditors, the Trustee has had to conduct an investigation almost entirely through discovery from third parties, public records and the recent involuntary imaging of the Debtor's electronic devices.  During the course of this case, the Trustee has discovered a large pool of victims, schemes and suspicious activity,

and expects to discover more as the case continues to develop. The Trustee's discoveries include, *inter alia*, the following:

(i)     Larry Grunfeld, a former associate of the Debtor, has accused the Debtor of forging his and his wife's signature on various transfer document and essentially stealing a cooperative apartment in Miami Beach, Florida;

(ii)    Annette Kleinfeld, an individual living in Israel, has accused the Debtor of operating "some sort of a Ponzi Scheme" and stealing over $400,000 from her on the pretense of investing it in the stock market and guarantying a twelve (12%) percent return;

(iii)   Arnold Young, an elderly man living in New Jersey, has accused the Debtor of forging his signature on various loan guaranty documents resulting in significant litigation, potential liability and legal fees;

(iv)    Yocheved Segal, the Debtor's wife, claims to be the Debtor's "biggest victim" and that the Debtor has forged her signature on numerous documents, including two mortgages placed on their home;

(v)     The Debtor routinely used his wife's notary stamp to acknowledge the signatures of third parties, even though she has not been a licensed notary public since in or around 1981;

(vi)    Abraham Hoschander, the Debtor's prior counsel, claims that the Debtor stole a check made payable to him and intended for his escrow account and then endorsed and cashed it;

(vii)   David Grossman has accused the Debtor of selling Mr. Grossman the Debtor's membership interest in an LLC and then selling the LLC's interest in real property without authority and unbeknownst to Mr. Grossman, and then retaining and dissipating the proceeds of the sale;

(viii)  The Debtor testified that he defrauded his own mother, who is 91-years-old, by having her unknowingly mortgage her home for the Debtor's benefit. The Debtor further testified that he defended the resulting foreclosure litigation without his mother's knowledge and forged her name on an affidavit and then forged his wife's signature as the purported notary to his mother's signature; and

(ix)    The Debtor transferred property owned by his wholly-owned LLC after filing for bankruptcy without disclosing it to the Trustee or the Court, and then spent the proceeds before the transfer was discovered.

The Trustee believes that the foregoing constitute only a partial list of the Debtor's misdeeds and that the continued investigation of the Debtor's financial affairs will result in the

discovery of significant, additional schemes and victims of those schemes. The purpose of the instant proceeding is to recover transfers that are presumptively intentionally fraudulent, constructively fraudulent, preferential and/or unauthorized post-petition, and to redistribute the recovered funds pro-rata to all of the Debtor's creditors and victims.

## INTRODUCTION

1.     On September 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").

2.     On or around the Petition Date, Richard E. O'Connell was appointed interim chapter 7 trustee of the Debtor's estate.

3.     On October 15, 2013, Mr. O'Connell presided over the initial meeting of creditors held pursuant to section 341(a) of the Bankruptcy Code, where he duly qualified and is consequently serving as permanent trustee of the Debtor's estate by virtue of section 702(d) of the Bankruptcy Code.

## BASIS FOR RELIEF

4.     This adversary proceeding (the "Adversary Proceeding") is brought pursuant to sections 502(d), 541, 542(a), 544(a), 548, 549, 550 and/or 551 of the Bankruptcy Code, and N.Y. Debtor and Creditor Law §§ 273, 274, 275, 276 and/or 276-a.

## JURISDICTION

5.     This Adversary Proceeding relates to the bankruptcy case of *In re Herman Segal,* Debtor, Case No. 13-45519 (Bankr. E.D.N.Y. Sept. 20, 2013) (the "Bankruptcy Case"), which is pending under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York before the Honorable Nancy Hershey Lord (the or this "Court" or "Bankruptcy Court").

6.      This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, Administrative Order No. 264 titled "In the Matter of The Referral of Matters to the Bankruptcy Judges" of the United States District Court for the Eastern District of New York (Weinstein, C.J.), dated August 28, 1986, and Administrative Order No. 601 of the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

7.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H) and (O).  Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

9.      The Trustee is a member of the panel of private chapter 7 bankruptcy trustees in this district established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1).  The Trustee is the duly appointed permanent chapter 7 trustee of the Debtor's estate and is empowered to bring this action.  The Trustee maintains an office for the conduct of business at 150-12 14th Avenue, Whitestone, New York 11357.

10.      The Debtor is an individual with a principal place of residence at 4115 Quentin Road, Brooklyn, New York 11234.

11.      The Defendant is an individual with a place of residence at one or more of the following: (i) 436 Candelwood Lake Road, Brookfield, Connecticut 06804, (ii) 350 West 57th Street, 7B, New York, New York 10019, or (iii) 11 Abbey Lane 1301, Danbury, Connecticut 06810.

## FACTS COMMON TO ALL CAUSES OF ACTION

I. **The Debtor's Bankruptcy Case**

   A. *The Debtor's General Refusal to Cooperate or Supply Information*

12.    While traveling in Austria, the Debtor filed this bankruptcy case on the Petition Date in order to stay the foreclosure sale of his shares and lease related to a cooperative apartment located at 4720 Pinetree Drive, Unit #15, Miami Beach, Florida (the "Miami Coop").

13.    Immediately after the filing, the Debtor generally refused to provide documents or information regarding his financial condition to the Trustee.  On October 10, 2013, the Trustee filed a motion to compel the Debtor to perform his duties under the Bankruptcy Code and turn over all books and records regarding the Debtor's financial affairs to the Trustee [Docket No. 15].

14.    On December 5, 2013, the Bankruptcy Court entered an order compelling the Debtor to file schedules, a statement of financial affairs and turn over all books and records by December 23, 2013 [Docket No. 37].

15.    On December 23, 2013, the Debtor filed his original bankruptcy schedules and statement of financial affairs wherein he refused to answer questions and make the disclosures required therein pursuant to his rights against self-incrimination granted by the Fifth Amendment of the United States Constitution (privilege referred to generally herein as the "Fifth Amendment") [Docket Nos. 41, 42 and 43].

16.    On January 23, 2014, the Debtor and his spouse, Yocheved Segal ("Ms. Segal"), appeared at the office of the Trustee's counsel for examinations pursuant to Bankruptcy Rule 2004.  At their examinations, Ms. Segal refused to answer any questions pursuant to the Fifth Amendment and the Debtor refused to answer most, but not all, questions for the same reason.

17.     On March 6, 2014, the Trustee filed a motion to compel the Debtor and Ms. Segal to produce books, records and documents and to hold them in contempt for failing to do so [Docket No. 66].  Ms. Segal ultimately relented and agreed to produce document but then claimed that she did not possess a single documents related to her or her husband's financial affairs.  On May 31, 2015, after fifteen months of delays and numerous opportunities provided by the Bankruptcy Court to respond to the Trustee's motion, the Debtor also conceded and stated as follows in an email to Trustee's counsel:

> Although an argument could be made that some of the documents are privileged, I elect not to claim the privilege as it relates to those requested Documents and hope to have everything on the list to you, by Friday the next.
> . . . .
> I will, G-d willing, have the requested Documents at your office by 5:00 PM on June 5th, 2015.

18.     Finally, on June 16, 2015, the Debtor produced a scant three hundred forty (340) pages of documents, which he claimed was the entirety of documents related to his financial affairs.

19.     Due in large part to the Debtor's failure to cooperate and supply information, on July 31, 2015, the Court entered a memorandum decision and order directing the Debtor to surrender his electronic devices for imaging by the Trustee and establishing a protocol for the Trustee's use of those images (the "Imaging Order") [Docket No. 260].

20.     When the Debtor produced his electronic devices in accordance with the Imaging Order, he had encrypted his personal computer making it impossible to fulfill the Imaging Order.  On August 14, 2015, the Court entered a subsequent order enforcing the Imaging Order [Docket No. 265].

21.     The images of the Debtor's devices were finally obtained August 11, 2015.  When searched, the following was discovered from the Debtor's electronic devices: (i) the Debtor

purchased and installed encryption software from Symantec on August 6, 2015, just seven days after the Court entered the Imaging Order; (ii) the Debtor used at least three different USB storage devices on August 10, 2015, which he failed to turn over; (iii) there were numerous visits to Dropbox, Google Docs, Google Drive, Gmail, Yahoo! and AOL, although no documents or other material were produced from those sites; (iv) Microsoft Outlook was configured to receive email but contained no data indicating that the emails had subsequently been deleted and destroyed; and (v) Microsoft Windows appeared to have been upgraded, which often destroys important and relevant metadata and other information.

22.     The Debtor has invoked his Fifth Amendment rights routinely during this proceeding when it has been convenient to do so.  The only explanation provided by the Debtor for invoking his Fifth Amendment rights was given at a September 4, 2014 hearing where he stated that he did not have to "give the Court a roadmap of possible scenarios," but that he had a fear of incriminating himself for "tax evasion," and "also a possibility of insider trading." Transcript, Sept. 4, 2014, p.67, LL. 9-10, 6-7 and 19-20, respectively.

### B. Counsel Changes

23.     Maxim Maximov ("<u>Maximov</u>"), an attorney practicing in Brooklyn, New York, filed the petition on behalf of the Debtor.  The Debtor later accused Maximov of incompetence in filing the bankruptcy petition.

24.     On February 21, 2014, Maximov filed a motion with the Bankruptcy Court seeking to withdraw as counsel to the Debtor claiming that "[t]he Debtor [was] refusing to follow Maximov's legal advice," and was "filing papers without consulting Maximov" [Docket No. 64].  On June 20, 2014, the Court entered an order approving Maximov's withdrawal [Docket No. 89].

25.     After Maximov's termination, the Debtor retained Rachel Blumenfeld ("Blumenfeld") as substitute counsel.  On July 16, 2014, Blumenfeld filed a motion to be relieved as counsel on the basis that the case now involved Fifth Amendment issues that were over her head and that there "has been a break-down in communication, as well as fundamental disagreement as to how to proceed" [Docket No. 96-1].  On August 8, 2014, the Court authorized Blumenfeld to withdraw as counsel [Docket No. 101].  Since Blumenfeld's withdrawal, the Debtor has acted *pro-se*, claiming that he is unable to afford an attorney.

### C.   The Motion to Dismiss

26.     On January 30, 2014, after spending four and one-half months in bankruptcy, the Debtor filed a motion to dismiss his Bankruptcy Case (the "Dismissal Motion") [Docket No. 54]. The Debtor cited mistake and confusion as the primary reasons in support of dismissal and stated further that "[the Trustee] is on a witch hunt and a fishing expedition to try to get [the Debtor] to violate [his] religious principles and . . . rights to freedom of association," and that the Trustee "is also interfering with [the Debtor's] relationship with [his] wife by dragging her into the case. . . " Id.

27.     On March 6, 2015, following significant briefing and a full evidentiary hearing, the Bankruptcy Court entered a decision denying the Dismissal Motion (the "Dismissal Decision") [Docket No. 188; reported at 527 B.R. 85].  In denying the Dismissal Motion, the Bankruptcy Court found, among other things, that the Debtor's "refusal to cooperate with the Trustee and reticence to make full disclosures to the Court, which already have burdened the estate with significant administrative costs, do not constitute cause for dismissal," and "[the Debtor] has operated in bad faith, and allowing him to voluntarily dismiss the case at this time would be improper." Id.

28.     On March 20, 2015, the Debtor timely filed a notice of appeal of the Dismissal Decision and related order to the United States District Court for the Eastern District of New York [Docketed at 15-cv-01525-KAM].  The Debtor has done nothing to prosecute his appeal and to date, has not filed a statement of issues on appeal, designation of record on appeal or brief of the issues.

### D. Bankruptcy Crime – 432 West 162nd Street

29.     On the Petition Date, the Debtor owned 432 West 162 Street Acquisition, LLC ("432 West LLC"), which owned real property at 432 West 162nd Street, New York, New York ("432 West").  This was not disclosed by the Debtor to the Trustee or the Bankruptcy Court in his schedules or otherwise.

30.     Unbeknownst to the Trustee, 432 West LLC sold 432 West on January 21, 2014, four months after the Petition Date, for $1,075,000.

31.     On July 10, 2014, the Trustee's counsel performed a routine litigation search on the Debtor and discovered an action titled *NRT New York LLC, d/b/a The Corcoran Group ("Corcoran") v. Herman Segal*, Index No. 650322/2014 (N.Y.S. Sup. Ct.), wherein Corcoran alleged that it had been retained by the Debtor to locate a buyer for 432 West which Corcoran had done, but that the Debtor failed to pay half the agreed upon commission.

32.     Had the Debtor not signed the Corcoran commission agreement in his individual name, the Trustee may never have discovered the 432 West post-petition transfer.

33.     While much of the proceeds of the 432 West sale were used to pay mortgages against 432 West, a significant amount was used by the Debtor or paid to affiliates of the Debtor as follows:

- $70,000 was transferred to MJSYRL Holdings Inc.;

- $50,000 was transferred to Darylann Demino, the Debtor's assistant;

- $10,000 was taken by the Debtor; and

- $109,131.38 was wired to the Debtor's company, Centurion Omega LLC, which was dissipated by the Debtor in various ways including over $50,000 in cash ATM withdrawals, and over $20,000 to American Express on third party accounts.

34.     In an effort to discover the foregoing, the Trustee served a subpoena upon David Fleischmann, counsel to 432 West.  According to Mr. Fleischmann, the Debtor informed him that if he provided any documents or information to the Trustee, the Debtor would report Mr. Fleischmann to the disciplinary committee for violating, among other things, the attorney-client privilege.

35.     The Debtor has issued similar threats to other former attorneys including Abraham Hoschander, Chaim Mandelbaum and Robert Teitelbaum.

36.     The Debtor knowingly and fraudulently concealed 432 West LLC and 432 West from the Trustee.

### E. Denial of Discharge

37.     On December 16, 2013, the Trustee commenced adversary proceeding no. 13-01545 against the Debtor seeking a denial of the Debtor's discharge for, among other reasons, the Debtor's failure to make necessary disclosures, turnover documents and cooperate with the Trustee.  On January 17, 2014, the Debtor answered the complaint [13-1545 Docket No. 6].

38.     Upon learning of the 432 West post-petition transfer, the Trustee moved for authority to amend his discharge complaint to include allegations regarding the 432 West transfer and on November 5, 2014, the Trustee filed an amended complaint [13-1545 Docket No. 21].

39.     The Debtor failed to file an answer to the amended complaint and on January 6, 2015, the Trustee moved for the entry of a default judgment against the Debtor [13-1545 Docket No. 26].  At the January 29, 2015 hearing on the Trustee's motion, the Debtor did not object and stated in response to the motion "[o]h, that's fine, I have no objection to that," and "I don't find myself under the Court's jurisdiction and under this bankruptcy."  Transcript at p.34, LL.17-21. Accordingly, on January 31, 2015, the Court entered an order and judgment denying the Debtor's discharge [13-1545 Docket Nos. 32 & 33].

## II.  The Debtor's Financial Affairs – Complex and Secretive

40.     The Debtor has not produced a single document related to his financial accounts. The only explanation provided by the Debtor for not retaining even a single bank statement is that "[e]very few weeks, piles of papers would get tossed out by my secretary or by the cleaning staff, and every time my office moved, papers didn't."  See Letter from Debtor to Trustee's Counsel, June 12, 2015.

41.     Thus far, the Trustee has identified forty-two (42) bank accounts that the Debtor has owned, used and/or controlled over the six (6) year period preceding the Petition Date as set forth on the following chart:

| Account Holder | Debtor Relationship | Financial Institution | Account No. |
|---|---|---|---|
| Centurion Omega LLC | Wholly-Owned LLC | Bank of America | ********0962 |
| Herman Segal | Debtor | Bank of America | ********4512 |
| The Chana Pollak 2004A IRREV LIT | Debtor Signatory | North Fork Bank, n/k/a Capital One | ********0496 |
| Chana Weider Trust No.#1 | Debtor Signatory and Trustee | Capital One | ********6410 |
| Toby Rothman Trust #3 | Debtor Signatory and Trustee | North Fork Bank, n/k/a Capital One | ********6402 |
| Lilly Segal or Herman Segal POA | Debtor Signatory | JPMorgan Chase Bank | ********1753 |
| Lilly Segal or Herman Segal POA | Debtor Signatory with Power of Attorney | JPMorgan Chase Bank | ********1901 |
| Lilly Segal or Herman Segal POA | Debtor Signatory with Power of Attorney | JPMorgan Chase Bank | ********8965 |
| Lilly Segal or Herman Segal POA | Debtor Signatory with Power of Attorney | JPMorgan Chase Bank | ********3565 |

| | | | |
|---|---|---|---|
| 3605 Quentin Road LLC | Debtor-Owned LLC | JPMorgan Chase Bank | ********0698 |
| David Rottenstein Family Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********6652 |
| Herman Segal or Yocheved Segal | Debtor Joint Account with Spouse | JPMorgan Chase Bank | ********7785 |
| The RP Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********5665 |
| Regina Graus Trust NO2 Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********9335 |
| Yehida Rothman 2002B Irrevocable Life Insurance Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********8282 |
| The Keren Yisroel V'Eljuelech Foundation Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********9405 |
| Cornage Rockaway Holding LLC | Debtor Signatory | JPMorgan Chase Bank | ********1456 |
| UTICA Brooklyn Acquisition Corp. | Debtor Signatory | JPMorgan Chase Bank | ********5507 |
| Detroit Six LLC | Debtor Signatory | JPMorgan Chase Bank | ********4267 |
| The Fay Klein 2005 Irr Life Ins Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********9405 |
| Josef Saks Irr Life Ins Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********2169 |
| The Magda Huss Irrev Life Ins Trust | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********6566 |
| Independent Planning Associates Inc. | Debtor Signatory | JPMorgan Chase Bank | ********6929 |
| Signature Premium Funding LTD | Debtor Signatory | JPMorgan Chase Bank | ********9172 |
| 49 Vernan Ave LLC | Debtor Signatory | JPMorgan Chase Bank | ********7604 |
| 1257 Pacific Street LLC | Debtor Signatory | JPMorgan Chase Bank | ********8008 |
| Cohenmadar Holding Corp. | Debtor Signatory | JPMorgan Chase Bank | ********0103 |
| Quietly Safe LTD | Debtor Signatory | JPMorgan Chase Bank | ********0764 |
| Mills Potczak & Company Inc. | Debtor Signatory | JPMorgan Chase Bank | ********0772 |
| Joseph Katzenstein Family Insurance Tru Moshe Schreiber Trustee | Debtor Signatory | JPMorgan Chase Bank | ********9831 |
| Charyl Segal, Herman Segal | Joint Account | JPMorgan Chase Bank | ********2880 |
| Herman Segal | Debtor | JPMorgan Chase Bank | ********2898 |
| Magda Huss Life Ins Trust Herman Segal Trustee | Debtor Signatory and Trustee | JPMorgan Chase Bank | ********2467 |
| Herman Segal | Debtor | JPMorgan Chase Bank | ********3316 |
| Centurion Settlements LTD | Debtor Signatory | JPMorgan Chase Bank | ********5147 |
| Omega Venture Capital LTD | Debtor Signatory | JPMorgan Chase Bank | ********6590 |
| 208 Lefferts Place LLC | Debtor Signatory | JPMorgan Chase Bank | ********7075 |

| Herman Segal | Debtor | Santander Bank | ********7912 |
| Delta Magazine Group LLC | Debtor Signatory | Santander Bank | ********3725 |
| Herman Segal DBA Exclusive Cleaners | Debtor | Santander Bank | ********8497 |
| Herman Segal | Debtor | Signature Bank | ********1078 |
| Herman Segal | Debtor | Meyers Associates, L.P. | ********1809 |

(collectively, the "Debtor Accounts").

42.    The Debtor routinely transferred funds in, out and amongst the Debtor Accounts. The Debtor heavily used his elderly mother's personal bank accounts over which he had a power of attorney, sometimes moving over $500k in and out of the accounts over a 30-day period.

43.    Most of the Transfers made by the Debtor make little sense without the benefit of the Debtor's explanations and testimony, which the Debtor will not provide invoking the Fifth Amendment.  To the Trustee's knowledge, there are no written explanations or support for an overwhelming majority of the transfers made by the Debtor to, from and amongst the Debtor Accounts.

### III.  Pre-Petition Fraudulent Activity and Schemes

44.    Even without the Debtor's testimony or earnest document production, the Trustee has uncovered myriad incidents of the Debtor's frauds and forgery, or alleged frauds and forgery.

#### A.  *Real Property*

##### 1.  4115 Quentin and the Israeli Mortgages

45.    In or around 2001, Shlomo Kolp ("Kolp") and the Debtor entered into an agreement pursuant to which Kolp would obtain title to the property at 4115 Quentin Road (also including 4113 Quentin Road), Brooklyn, New York (the "Brooklyn Property") and grant certain mortgages against the Property, and the Debtor would fund the purchase of the Property and maintain the mortgages granted thereon.  At all times after Kolp's acquisition of the Property, the Property was occupied by the Debtor and not by Kolp.

14

46.     By deed dated August 1, 2001, Kolp obtained title to the Property in fee simple from Barbara and Timothy Bracci.

47.     On August 1, 2001, Kolp granted a mortgage against the Property to Fairmont Funding Ltd. in the maximum principal amount of $640,000 (the "First Mortgage"), and on December 3, 2002, Kolp granted a mortgage against the Property to Fleet National Bank in the maximum principal amount of $250,000 (the "Second Mortgage").

48.     On or around November 10, 2003, the Debtor executed a mortgage document purporting to grant a mortgage in the Property to Avigdor Landesman and Eleizer Silber "as trustees" in the principal amount of $500,000 (the "First Israeli Mortgage").  Kolp held title to the Property when the Debtor granted the First Israeli Mortgage against the Property.

49.     On or around August 9, 2005, Kolp transferred title of the Property to the Segals as tenants by the entireties for stated consideration of $10.00.  Upon information and belief, the holders of the First Mortgage and Second Mortgage, as may have been amended, were completely unaware that title to the Property was transferred from Kolp to the Segals.

50.     A draft letter, dated August 20, 2014, to an unknown recipient located on the Debtor's computer provided some explanation for the mysterious relationship between the Debtor and Kolp as follows:

> On approximately August 1, 2001, my wife and I purchased the above referenced house [the Brooklyn Property] as our primary residence.  Because I did not have the full purchase price of $800,000 for the acquisition, I needed a mortgage.  As my credit was not good enough to obtain a mortgage, I was able to persuade Mr. Shlomo Kolp, who at the time was a good friend of mine, and had excellent credit, to allow me to use his name as the "name" buyer as a so called "strawman".  As I had been Mr. Kolp's attorney, and since he was a recent immigrant, I was able to convince him that there was nothing illegal, immoral, nor unethical regarding this transaction.

> *******

15

> In about August of 2005, Mr. Kolp began having marital issues, and his wife, Mrs. Ettie Kolp began threatening Mr. Kolp that she was going to go after my house as Marital assets, (even though she knew that the house did not belong to Mr. Kolp), unless he gave in to her demands regarding the custody of the children. We therefore transferred the house to my wife and myself, reflecting the reality of the ownership as it truly was from the inception.

51. On May 1, 2006, Messrs. Landesman and Silber executed an assignment of the First Israeli Mortgage to eight individuals residing in Israel.

52. On March 11, 2008, the Debtor and his wife, Ms. Segal (collectively, the "Segals") each executed a mortgage document purporting to grant a mortgage in the Property to Landesman and Silber in the principal amount of $300,000 (the "Second Israeli Mortgage"). Ms. Segal testified that she never signed the Second Israeli Mortgage and was completely unaware of the existence of the First or Second Israeli Mortgage until the Trustee brought it to her attention in 2014.

53. On August 25, 2009, the Segals each executed a mortgage document purporting to grant a mortgage in the Property to Kleinfeld and Green in the principal amount of $400,000 (the "Third Israeli Mortgage"). As with the Second Israeli Mortgage, Ms. Segal testified that she never signed the Third Israeli Mortgage and was completely unaware of the existence of the First, Second or Third Israeli Mortgage until the Trustee brought it to her attention in 2014.

54. On November 17, 2010, the Debtor executed a promissory note in favor of Kleinfeld in the principal amount of $393,600, requiring repayment in four equal installments of $98,400 due on June 1, September 1 and December 1, 2012, and March 1, 2013 (the "Kleinfeld Note").

55. On or around February 4, 2014, Kleinfeld commenced a suit against the Debtor in New York State Supreme Court, Kings Count (see Kleinfeld v. Segal, Index No. 500930/2014 (N.Y. Sup. Ct.)), to collect on the Kleinfeld Note.

16

56.     In connection with that action, Ms. Kleinfeld submitted an affidavit, dated January 14, 2014, wherein she testified, among other things, that:

> I was advised that [Debtor] was an expert in trading in the stock markets. [Debtor] promised me a ten-percent return on my investment and assured me that I would receive one-percent of my investment as a dividend every month to pay for my bills and medications.
>
> *****
>
> [Debtor] provided no detailed information with respect to the type of loan I was making or where my money would be invested, nor did I receive anything in writing.  However, I trusted [Debtor] completely because he was so highly regarded by his then-business partner, who assured me that Defendant handled his and his family's money for years, resulting in great profits.
>
> ******
>
> For a few months, [Debtor] paid me some dividends on the Loan [of $400,000]. However, in the Spring of 2010, his then-business partner succumbed to bone marrow cancer and died, and subsequently, [Debtor] ceased making payments to me altogether.

Kleinfeld Affidavit.

57.     On October 22, 2014, the Trustee commenced an adversary proceeding captioned *O'Connell v. Shlomo Kolp, et al.*, Adv. Pro. No. 14-1140 (NHL), seeking a determination of the extent, validity and priority of all liens, claims and encumbrances against the Brooklyn Property and authority to liquidate the Brooklyn Property for the benefit of the estate and its creditors. That adversary proceeding is ongoing.  However, both the Debtor and Kolp have defaulted and default judgments have been entered against them divesting them of any interest in the Brooklyn Property and directing their vacatur of such property.

## 2.   The Miami Coop – Alleged Theft of a Cooperative Apartment

58.     On or around August 8, 2008, The Esquire House of M.B., Inc. (the "Esquire House"), the cooperative association in connection with the Miami Coop, issued the shares in the

Miami Coop to the Debtor. The certificate was executed by Grant N. Epstein and Amanda R. Roziar as the President and Secretary of the Esquire House, respectively (the "Debtor Coop Certificate").

59.     The Debtor Coop Certificate was properly and promptly recorded with the Dade County Clerk on August 26, 2008 under CFN 2008R0693250, Book 26538, Pgs. 0013-14. The Debtor Coop Certificate has been freely and publicly available on the Dade County Clerk's website since at or around the date of its recording.

60.     The Debtor filed his bankruptcy petition in order to stay the judicial sale of the Miami Coop by the Esquire House which was owed significant sums in back dues. On October 24, 2013, the Trustee filed a motion for authority to sell the Miami Coop [Docket No. 20], and on February 5, 2015, the Court entered an order authorizing the Trustee to sell the Miami Coop [Docket No. 55].

61.     The Debtor tried routinely to frustrate and delay the sale of the Miami Coop. Among other things, the Debtor authorized his assistant, Darylann Demino ("Demino") and her boyfriend, Luis Leon, to live in the Miami Coop rent-free in order to frustrate the Trustee's sale. Most significantly, in or around October 2014, eight months after the Court's entry of an order authorizing the Trustee's sale of the Miami Coop, but before the Trustee could consummate the sale, the Debtor informed the Defendant of the bankruptcy and sale order.

62.     Upon information and belief, the Defendant has had a business relationship and friendship with the Debtor since the early 1990's where the two met in prison. The Defendant and the Debtor did multiple real estate transactions together wherein the Debtor would hold a power of attorney for the Defendant and commit the Defendant to various transactions with the Defendant's knowledge and consent.

18

63.    On December 3, 2014, the Defendant commenced an adversary proceeding against the Trustee captioned *Grunfeld v. O'Connell, et al.*, Adv. Pro. No. 14-1224 (NHL) wherein the Defendant alleged that the Debtor stole the Miami Coop by forging the Defendant's name on certain transfer documents dating back to 2004 and 2008 (the "Grunfeld Adversary Proceeding").

64.    The Defendant further alleged that the notaries that acknowledged his signatures on the transfer documents, Ms. Segal and Robert Steinherz ("Steinherz"), did so fraudulently. Yocheved Segal has testified that it is not her signature on the document, that she never witnessed the Defendant's signature and that she has not been a licensed notary since 1981. Steinherz has testified that he did in fact witness the Defendant sign the relevant transfer document.

65.    The Grunfeld Adversary Proceeding is currently ongoing and the sale of the Miami Coop has been delayed pending completion thereof.  In the meantime, Demino and her boyfriend continue to occupy the Miami Coop without paying rent.

### 3.    Parkway Starlight – Alleged Theft of Real Estate

66.    On or around September 20, 2011, DLJ Mortgage Capital, Inc. sold the real property at 1171 Eastern Parkway, Brooklyn, New York (the "Parkway Property") to Parkway Starlight LLC ("Parkway Starlight"), an entity owned and controlled by the Debtor, for stated consideration of $170,000.

67.    On or around January 15, 2013, the Debtor through Parkway Starlight sold the Property to Methlyn Green for stated consideration of $750,000, over four (4) times what Parkway Starlight purchased it for just over one (1) year prior.  The Debtor executed the deed as President of Parkway Starlight.

68.     On or around April 14, 2015, an action was commenced in New York State Supreme Court for the County of Kings captioned *Parkway Starlight, LLC v. Methlyn Green and Emigrant Funding Corp.*, Index No. 504381/2015 (the "Parkway Action"), by filing a complaint (the "Parkway Complaint").

69.     The following salient allegations were made in the Parkway Complaint:

- On January 19, 2012, the Debtor sold his membership interest in Parkway Starlight to David Grossman for $450,000, and the Debtor was granted an option to purchase the ownership interest in Parkway Starlight on or before July 19, 2012 for $510,000;

- Abraham Hoschander executed an agreement wherein he agreed to pay all claims against Parkway Starlight so that the Parkway Starlight membership interest would be delivered to David Grossman free and clear of any liens;

- The Debtor never exercised his option to redeem the interest in Parkway Starlight by July 19, 2012;

- When the Debtor committed Parkway Starlight to the sale of the Parkway Property to Methlyn Green on January 15, 2013, he had no right to do so pursuant to the prior sale to David Grossman and that accordingly, the Debtor's actions were fraudulent;

- The Debtor fraudulently retained the proceeds of the sale of the Parkway Property to Methlyn Green; and

- On November 12, 2014, David Grossman sold and assigned his membership interest in Parkway Starlight to Ravenwood Holding, LLC.

70.     Abraham Hoschander claims that his signatures were forged in connection with the foregoing agreements with David Grossman.

71.     The Parkway Action is ongoing before the State Court and is unresolved as of the date of the instant Complaint.

### 4.  Reyes & Prestino – Two Sales of the Same Property

72.     On January 25, 2011, Eagle Park Holding, LLC ("Eagle Park") was formed by the Debtor by the filing of a certificate of formation with the New York State Department of State.

73.    On January 25, 2011, Eagle Park acquired the real property known as 2179 East 33rd Street, Brooklyn, New York (the "Eagle Park Property") from Charisse A. Mobilia as surviving tenant by the entirety of James Mobilia for stated consideration of $366,500.

74.    Upon information and belief, the Debtor entered into a lending transaction with Harry Einhorn ("Einhorn") either at the time Eagle Park acquired the Eagle Park Property or afterward.  In order to provide Einhorn with security for repayment of the loan, the Debtor transferred a one-hundred (100%) percent membership interest in Eagle Park (the "Eagle Park Interest").

75.    In or around August 15, 2013, the Debtor borrowed $275,000 from Galpern (the "Galpern Loan").  At or around the same time, Einhorn transferred the Eagle Park Interest to Galpern to secure the Debtor's repayment of the loan from Galpern.

76.    In connection with the Galpern Loan, Eagle Park and the Debtor entered into a lease (the "Eagle Park Lease"), pursuant to which the Debtor was required to pay rent and the Debtor was granted a purchase option allowing the Debtor's re-purchase of the Eagle Park Interest for a stated price within a year.

77.    In or around March 1, 2014, the Debtor stopped paying the rent due under the Eagle Park Lease and Eagle Park commenced a non-payment and eviction proceeding captioned: Eagle Park Holding LLC v. Herman Segal, L&T Index No. 4519/2014 in Kings County Landlord-Tenant Court (defined above as the L&T Court).  Eagle Park subsequently learned that the Debtor was a debtor in bankruptcy and that the eviction of the tenants was stayed.

78.    On October 16, 2015, Eagle Park made a motion with this Court for relief from the automatic stay so that it could proceed with the eviction action [Docket No. 124].  Upon

inspection of the motion and underlying documents, the Trustee discovered the Eagle Park Lease and the purchase option.

79.    On December 3, 2014, the Trustee filed a motion for approval of a settlement between the Trustee, Galpern and Eagle Park, pursuant to which Eagle Park is required to sell the Eagle Park Property and remit all net proceeds to the Trustee for the benefit of the Debtor's estate [Docket No. 142].   The settlement between the Trustee, Eagle Park and Galpern was approved by the Court by order dated February 3, 2015 (the "Eagle Park Sale Order") [Docket No. 171].

80.    Pursuant to the Eagle Park Sale Order and related orders, Eagle Park continued its efforts to evict the tenants of the Eagle Park Property so that the property could be sold.

81.    On June 29, 2015, Victoria Prestino ("Prestino") and Roderick Reyes ("Reyes") commenced an adversary proceeding in this Court captioned *Prestino & Reyes v. O'Connell, et al.*, Adv. Pro. No. 15-1076 (NHL), pursuant to which Prestino and Reyes allege that:

- After transferring the Eagle Park Interest to Galpern, the Debtor transferred the "real" membership interest in Eagle Park to an individual named Dominick Racigliano ("Racigliano") in exchange for $80,000;

- Prestino purchased Racigliano's membership interest from Racigliano on May 31, 2015 for $80,000;

- On May 31, 2015, Prestino granted Reyes, her boyfriend and co-occupant of the Parkway Property, a life estate in the Parkway Property; and

- Based on the foregoing, Prestino, and not Galpern, is the true owner of Eagle Park and the Eagle Park Property.

82.    Subsequent depositions of Prestino and Reyes on July 31, 2015, revealed that: (i) Prestino still has not paid anything to Racigliano for his purported interest in Eagle Park; (ii) neither Prestino nor Reyes have ever met Racigliano and that in fact, they relied entirely on the Debtor to negotiate the transactions and create and transmit the relevant transfer and life estate

documents; (iii) Prestino and Reyes did not have attorneys in connection with their negotiation or entry into any of the transactions on May 31, 2015; (iv) the Debtor introduced Prestino and Reyes to their attorneys, Bronstein, Gewirtz & Grossman, LLC (the "Bronstein Firm"), and that they had no written retainer with the Bronstein Firm and had not paid the Bronstein Firm anything to date; and (v) nobody had informed Prestino or Reyes that the Bronstein Firm was simultaneously representing the Debtor's mother in a case where the Debtor had admitted to defrauding his 91-year-old mother and forging her and his wife's signatures (as described below).

83.    The disputes between the Trustee, Prestino, Reyes, Racigliano, Eagle Park and Galpern are ongoing.

### 5.   The Debtor Defrauds his own 91-Year-Old Mother

84.    Lilly Segal is the Debtor's 91-year-old mother.  Lilly Segal is the title owner of 1257 and 1257A 59th Street Brooklyn, New York (the "Lilly Segal Property") and has lived in 1257A 59th Street since it was built by her husband in or around 1978.

85.    In or around 2009, Lilly Segal granted a mortgage against the Lilly Segal Property in connection with a loan taken from FOT Managers or its predecessor in interest.  FOT Manager, Lilly Segal, the Debtor and others have been involved in a foreclosure action over the Lilly Segal Property since 2010 captioned *FOT Mangers v. Independent Planning Assoc., Inc., et al.*, Index No. 15110/2010 (N.Y. Sup. Ct., Kings Cty.) (the "FOT Managers Litigation").

86.    On July 9, 2015, the Debtor submitted an affidavit in connection with the FOT Managers Litigation wherein he testified as follows:

> In connection with a loan I took in 2009, I asked my mother to sign a paper.  The paper was a mortgage on her house.  I did not explain to her what she was signing, nor do I believe she knew what she was signing.  My mother did not borrow nor receive any money from the loan, nor did she understand that she was

pledging her home.

I learned about this case when I received a call from the Court appointed receiver asking for rental records.  My mother did not know about the case, nor did I tell my mother about it, as I did not want to upset her.  Rather, I hired Abraham Hoschander, Esq. and asked him to defend her.  My mother had no contact whatsoever with Abraham Hoschander, and did not know of the case nor that he had been hired to defend her.

When Abraham Hoschander needed information I alone gave it to him, and when he needed an affidavit from my mother for the case, I forged my mother's name on the affidavit without telling her about it, and I forged my wife's notarization on the forged affidavit using my wife's old notary stamp.

87.    Lilly Segal further alleged in connection with the FOT Managers Litigation that "[she] is an innocent victim as she did not take a loan, and all activity was done by her son Herman who took advantage of his elderly mother." Lilly Segal Application July 9, 2015, ¶5.

88.    Lilly Segal is represented in the FOT Managers Litigation by the Bronstein Firm, the same firm that represents Prestino and Reyes in their litigation against the Trustee.

### B. Life Insurance – STOLI Transactions and Life Insurance Trusts

89.    The Debtor is or was involved in numerous transactions involving life insurance policies and life insurance trusts.  In the past six years, the Debtor transferred not less than $2 million to over six (6) life insurance companies from accounts owned and/or controlled by the Debtor (the "Life Insurance Transfers").  The Debtor has not produced a single document to explain the purpose of the Life Insurance Transfers or any ultimate source of their funding.

90.    Upon information and belief, most of the Life Insurance Transfers were made on account of investor-originated life insurance ("IOLI") or stranger-originated life insurance ("STOLI") transactions, which run afoul of state insurable interest laws which protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued.

91.     A typical STOLI transaction was described by a court as follows:

This case concerns an aspect of a growing cottage industry in the insurance market, known as stranger-owned life insurance policies or "STOLI" plans, in which an individual, typically an elderly one, procures life insurance on his own life in order to subsequently assign the policy to a third party following the lapse of the two-year contestable period.  STOLI transactions are the produce of the burgeoning "life settlements" market, in which insured's sell unneeded or unaffordable permanent policies to investors.  See Jensen & Leimberg, 885, supra, at 111.  STOLI schemes emerged as investors' demand for these policies exceeded supply, leading industry speculators to solicit insureds to take out additional policies, even if the insureds had no particular need for supplemental insurance coverage.  Often, the insureds are persuaded to engage in these STOLI transactions because their bank accounts have run dry and they are forced to spend increasing amounts on medical care.  As one court put it, "[o]ften pejoratively, termed 'stranger-owned life insurance policies' these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early demise." Life Pro. Clearing LLC v. Angel, 520 F.Supp.2d 646, 648 (S.D.N.Y. 2008).

A typical STOLI transaction is structured as follows.  An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale of the policy.  The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy.  The candidate then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy.  "At that time, the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured. . . If the insured survives the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure." Jensen & Leimberg, supra, at 111.  The insureds are usually able to garner significantly greater sums from speculators than they would receive by surrendering the policy to the insurance company.  See Liam Pleven & Rachel Emma Silverman, Cashing in An Insurance Man Buiolds a Lively Business in Death-As Life Settlements, Boom, Banks, Regulators Circle, Wall St. J. Nov. 27, 2007, at A1.

Lincoln National Life Insurance Company v. Calhoun, et al., 596 F. Supp. 2d 882, 884-885

(D.N.J. 2009).

92.     As described by another court:

In such an arrangement (stranger-originated life insurance or investor-initiated life insurance) a policy is purchased, not with a view of the insured paying premiums for the benefit of the insured's family, but with a view toward reselling policy to an "outside investor" in a secondary market for the life insurance. The outside investor pays the insured in order to make a "wager" on the duration of the insured's life.

\* \* \*

Under New York Law, as well as the long-standing public policy recognized by New York courts, it is illegal for anyone to procure, or cause to be procured, a life insurance policy on an insured for the benefit of an outside investor who does not have an insurable interest in the insured. To conceal the real policyholder's lack of insurable interest from the insurer, as well as to induce the insured's application, investors establish an irrevocable trust solely to hold the target insurance policy. The trust is established around the time that the insured submits his application, and is named as the owner and beneficiary of the policy with the beneficiary being entitled to the death benefits payable under the policy. The beneficiary of the trust is typically disclosed to the insurer and designed as the insured or a family member. Once the policy is issued, the insured transfers the beneficial interest in the policy to an outside investor in exchange for a significant lump sum payment.

<u>Phoenix Life Ins. v. Irwin Levinson Ins. Tr. II</u>, 2009 New York Slip Op. 30383.

93.     Just from documents produced by JPMorgan Chase bank, the Trustee has identified numerous life insurance trusts in which the Debtor serves as trustee or otherwise owns or controls the trust's bank accounts. Such trusts identified are in the names of: (i) Regina Graus, (ii) Fay Klein, (iii) Magda Huss, (iv) Joseph Katzenstein, (v) Chana Pollak, (vi) Toby Rothman, (vii) Yehida Rothman, (viii) David Rottenstein, (ix) RP Trust, (x) Josef Saks, and (xi) Chana Weider.

94.     The Trustee believes that most, if not all, of the Life Insurance Transfers constitute avoidable fraudulent conveyances because: (i) they were made in furtherance of the Debtor's ongoing Ponzi scheme; (ii) they were made in furtherance of illegal STOLI transactions on policies that are void, voidable or subject to rescission by the respective life insurance

company by virtue of the illegality of the transactions; and/or (iii) the Debtor received no benefit in exchange for such transfers.

### 1. **The Arnold Young Transactions**

95.    The only STOLI transaction to which the Trustee has significant insight is that with Arnold Young because it resulted in significant litigation before this Court and the U.S. District Courts for the District of New Jersey and Southern District of New York.  See <u>Apliko, LLC v. Arnold Young</u>, Case No. 13-cv-4948 (S.D.N.Y. Jul. 17, 2013); <u>Principal Life Insur. Co. v. Arnold Young, Herman Segal, et al.</u>, Case No. 14-cv-00198 (D.N.J. Jan. 10, 2014); <u>Arnold Young v. Herman Segal</u>, Case No. 14-cv-01997 (D.N.J. Mar. 31, 2014); <u>Arnold Young v. Herman Segal</u>, Adv. Pro. No. 14-1122 (Bankr. E.D.N.Y. Sept. 4, 2014).

96.    According to Arnold Young, in or around May 2008, the Debtor induced him to participate in STOLI transactions and unbeknownst to Mr. Young, the Debtor financed the premiums on the policy through a loan by third party HM Ruby Fund, L.P. ("<u>HM Ruby</u>").

97.    In or around July 17, 2013, Apliko, LLC, the assignee of the loan extended by HM Ruby, commenced an action against Arnold Young to collect on a guaranty Mr. Young provided to HM Ruby on the loan obligations.  According to Mr. Young, his signatures on the guaranty and loan documents were forged by the Debtor.

98.    The transactions involving Mr. Young resulted in not less than four pieces of litigation, including: (i) Apliko, LLC against Arnold Young seeking to collect on a loan guaranty; (ii) Arnold Young against the Debtor in District Court seeking a judgment on account of the Debtor's fraudulent conduct; (iii) Principal Life Insurance Company against Arnold Young, the Debtor and other parties seeking, among other things, a declaration that the life insurance policy is void *ab initio* because it is part of an unlawful STOLI transaction; and (iv)

Arnold Young against the Debtor seeking a declaration that all claims Mr. Young has against the Debtor are non-dischargeable as a result of the Debtor's fraudulent conduct.

### C. Specific Instances of Forgery and Fraud

99.     Although the Trustee's investigation has been limited and hampered by the Debtor's refusal to turn over documents and cooperate, the Trustee has identified numerous instances where the Debtor has, upon information and belief, forged various signatures. The Trustee has further identified numerous other examples of where third parties have accused the Debtor of forging signatures.

### 1.  <u>Lilly Segal</u>

100.     As outlined above, the Debtor admitted in affidavit testimony to forging his mother's signature on legal papers as well as his wife's signature as the notary public witness to his mother's signature.

101.     The Debtor has, upon information and belief, falsified powers of attorney documents wherein his mother has purportedly granted him power of attorney to commit her to various transactions.

102.     Moreover, the Debtor has maintained not less than four bank accounts in the last six (6) years in his mother's name where he has been a signatory with power of attorney (collectively, the "<u>Mother's Accounts</u>").  The Debtor has used his Mother's Accounts to move millions of dollars for purposes wholly unrelated to the care of his elderly mother.  By way of example:

- In April and May, 2008, the Debtor deposited funds from an unknown source into Mother's Account at Chase (***1753) and then moved over $300,000 to his own Chase account (***7785);

- In June and July, 2008, the Debtor deposited funds from an unknown source into Mother's Account at Chase (***1753) and then moved $100,000 to his account at

Signature Bank (***3576) and $31,000 to Omega Small Capital's account at Chase (***6365);

- In July and August 2008, the Debtor deposited $398,000 from the Gerald Brauser Life Ins Trust into his Mother's Account at Chase (***1753); and

- In August 2008, the Debtor deposited over $516,000 from unknown sources into Mother's Account at Chase (***1753) and moved it back out to accounts he owned or controlled at Signature Bank.

Transactions like the foregoing continued through 2009 when they ended suddenly for reasons unbeknownst to the Trustee.

## 2. Yocheved Segal

103.    The Trustee has identified the Debtor's wife's, Yocheved Segal's, a/k/a Yocheved Simon, signature as an acknowledging notary public to others' signatures on numerous occasions including the following:

- Signatures of Larry Grunfeld, dated May 26, 1998 and April 18, 2002, in connection with powers of attorney granted by Grunfeld to the Debtor;

- Signatures of Larry Grunfeld, dated January 19, 2004 and February 2, 2004, in connection with the Miami Coop;

- Signature of Lilly Segal, dated August 4, 2006, in connection with a power of attorney granted by Lilly Segal to the Debtor;

- Signature of Michelle Salamon, dated December 18, 2006, in connection with a power of attorney granted by Salamon to the Debtor;

- Signature of Arnold Young, dated April 1, 2008, in connection with the Arnold Young transactions;

- Signature of William J. Segal, dated August 1, 2008, in connection with certain loan documents; and

- Signature of Jeffrey Kret, dated September 2, 2008, in connection with the Arnold Young transactions.

104.    According to Yocheved Segal, it is not her signature on any of the foregoing documents and she has not been a notary public since 1981.  Yocheved Segal further testified

that her signature on the following documents is not her own, and that she is unaware of the documents' existence until recently:

- The Second Israeli Mortgage against the Brooklyn Property executed on March 11, 2008 (signature witnessed by Jason Beyer and acknowledged by notary Robert Steinherz);

- The Third Israeli Mortgage against the Brooklyn Property executed on August 25, 2009 (signature witnessed by Arthur Silver and acknowledged by notary Nachum Salzman); and

- Limited Liability Company Operating Agreement of Penns Landing Omega II LLC dated January 9, 2015.

105.    Upon information and belief, the Debtor has maintained his wife's old notary stamp and used it to acknowledge the signatures of third parties, both real and forged, on legal documents for at least fifteen years.

### 3. **Abraham Hoschander**

106.    Abraham Hoschander is an attorney who represented the Debtor and certain of their interests until the two had a falling out.  According to Hoschander, the Debtor forged his signature on at least the following documents:

- the endorsement of a check made payable to Abraham Hoschander on or around July 1, 2011, in the amount off $10,000; and

- an agreement dated January 19, 2012 between the Debtor and David Grossman pursuant to which "Abraham Hoschander will pay all claims if any against Parkway Starlight, LLC so that the LLC is delivered free and clear of any liens.

### 4. **Robert Steinherz**

107.    Steinherz was an employee of JPMorgan Chase Bank ("Chase"), where the Debtor did most banking for himself, his various companies and life insurance trusts until sometime in or around 2010.  According to Steinherz, he met the Debtor in or around 2004 while employed at Chase.

108.    Steinherz is a licensed notary public in the State of New York.  Steinherz is the acknowledging notary public of the signatures of: (i) the Debtor and Yocheved Segal on a certain mortgage of the Brooklyn Property granted on March 3, 2008; (ii) Larry Grunfeld on a certain affidavit regarding the request for replacement share certificates in the Miami Coop dated May 15, 2008; and (iii) Larry Grunfeld and Tina Witt on a certain assignment of proprietary lease for the Miami Coop dated July 9, 2008.

109.    The Defendant, Tina Witt and Ms. Segal claim that their signature was forged on each of the foregoing documents and that they never signed anything in the presence of Steinherz.  Steinherz testified that he acknowledged each of their signatures in their presence and reviewed their drivers' license or other acceptable identification before doing so.

### D.  Stock Trading and Alleged Ponzi Schemes

110.    Very little is known about the Debtor's stock and option trading activities.  Upon information and belief, the Debtor professed to be an expert in the markets and offered investment services to certain individuals, including the holders of the First, Second and Third Israeli Mortgages, or their predecessors in interest.  As stated above, Annette Kleinfeld testified that she was told that the Debtor was an expert in trading stocks.  When Ms. Kleinfeld failed to get recourse against the Debtor, she accused the Debtor of operating "some kind of Ponzi scheme."

111.    On or around March 19, 2013, the Debtor executed an agreement and schedules thereto pursuant to which he was permitted to trade stock options through clearing house Sterne Agee.  According to those documents signed by the Debtor, on March 19, 2013, six months prior to the Petition Date, the Debtor had annual income of $500,000, total net worth excluding his residence of $10 million, and liquid net worth of $3 million.  Upon information and belief, none

of the foregoing statements were true or alternatively, none of the Debtors' assets have been disclosed to the Trustee.

112.    From what little information the Trustee has, the Debtor appears to have transferred over $2.5 million to now bankrupt Penson Financial Services since 2008, more than $1.9 million of which was to an account in his wife's name, and over $100,000 to Sterne Agee in the year prior to the Petition Date.  It is unclear at this time how the funds were invested or withdrawn.

### E. Bankruptcy Abuses

113.    The Debtor has orchestrated various bad faith voluntary and involuntary bankruptcy filings since the pendency of this Bankruptcy Case in order to stay foreclosures of property of his or his family members in which he has an interest.

114.    On March 13, 2014, the Debtor orchestrated the filing of a chapter 11 petition by Utica Brooklyn Acquisition Corp. in this Court (Case No. 14-41127; Stong, J.)  That case was dismissed on May 28, 2014.

115.    On July 17, 2014, the Debtor orchestrated the filing of an involuntary chapter 7 petition against Utica Brooklyn Acquisition Corp. in this Court (Case No. 14-43647; Stong, J.) by Mayer Orgel.  Mr. Orgel never appeared to prosecute the case and it was dismissed on February 20, 2015.

116.    On January 29, 2015, the Debtor orchestrated the filing of a second involuntary chapter 7 petition against Utica Brooklyn Acquisition Corp. in this Court (Case No. 15-40376; Stong, J.) by his assistant and friend, Darlyann Demino, a/k/a Rene Demino.  That case was dismissed almost immediately on February 23, 2015.

117. On October 1, 2014, the Debtor orchestrated the filing of an involuntary chapter 7 petition against his mother, Lilly Segal, in this Court (Case No. 14-45032; Stong, J.) by Paul Rohe, in order to stay a foreclosure sale on his mother's property. Mr. Rohe never appeared to prosecute the case and it was dismissed on January 8, 2015.

118. On March 5, 2015, the Debtor orchestrated the filing of a second involuntary chapter 7 petition against his mother, Lilly Segal, in the U.S. Bankruptcy Court for the Southern District of Florida (Case No. 15-14101; Mark, J.) by Demino. That case was dismissed on May 15, 2015, with the following finding:

> The Court finds that the Involuntary Bankruptcy filing was a sham, made in bad faith, and likely orchestrated by the Alleged Debtor's son, Herman Segal, to frustrate the foreclosure efforts of FOT Managers.

## IV. Facts Specific to the Instant Case

119. Prior to the Petition Date, the Debtor made the following transfers to the Defendant:

| Transferor | Account | Check No. | Date | Amount |
|---|---|---|---|---|
| Herman Segal | Sig *1078 | 513 | 1/17/2008 | $10,000.00 |
| Herman or Yocheved Segal | Chase*7785 | 2792 | 1/28/2008 | $ 815.00 |
| Herman or Yocheved Segal | Chase*7785 | 2800 | 2/27/2008 | $ 815.00 |
| Herman Segal | Sig *1078 | 728 | 3/18/2008 | $ 9,800.00 |
| Herman or Yocheved Segal | Chase*7785 | 2809 | 3/27/2008 | $ 815.00 |
| Herman or Yocheved Segal | Chase*7785 | 2818 | 4/28/2008 | $ 815.00 |
| Herman or Yocheved Segal | Chase*7785 | 2837 | 5/27/2008 | $ 815.00 |
| Herman Segal | Sig *1078 | 871 | 6/14/2008 | $10,000.00 |
| Herman or Yocheved Segal | Chase*7785 | 2839 | 6/27/2008 | $ 815.00 |
| Herman Segal | Sig *1078 | 888 | 7/11/2008 | $ 9,995.00 |
| Herman or Yocheved Segal | Chase*7785 | 2849 | 7/28/2008 | $ 815.00 |
| Herman or Yocheved Segal | Chase*7785 | 2853 | 8/7/2008 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9017 | 8/20/2008 | $ 9,999.00 |
| Herman Segal | Sig *1078 | 9017 | 8/20/2008 | $ 9,999.00 |
| Herman or Yocheved Segal | Chase*7785 | 2871 | 9/29/2008 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2875 | 10/7/2008 | $ 1,051.00 |

| | | | | |
|---|---|---|---|---|
| Herman or Yocheved Segal | Chase*7785 | 2679 | 10/27/2008 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2882 | 11/7/2008 | $ 1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 2885 | 11/28/2008 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2888 | 12/8/2008 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 1043 | 12/15/2008 | $ 7,500.00 |
| Herman or Yocheved Segal | Chase*7785 | 2891 | 12/29/2008 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2901 | 2/9/2009 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 1088 | 2/27/2009 | $ 4,000.00 |
| Herman or Yocheved Segal | Chase*7785 | 2915 | 2/27/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2918 | 3/27/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2924 | 4/27/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2931 | 5/27/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2937 | 6/29/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2943 | 7/2/2009 | $ 2,458.00 |
| Herman or Yocheved Segal | Chase*7785 | 2947 | 8/7/2009 | $ 1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 2950 | 8/27/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2953 | 9/8/2009 | $ 1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 2962 | 10/7/2009 | $ 1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 2957 | 10/28/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2963 | 10/30/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2966 | 11/9/2009 | $ 1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 2979 | 12/9/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2981 | 12/28/2009 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 2988 | 1/29/2010 | $ 2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 3003 | 3/1/2010 | $2,458.54 |
| Herman or Yocheved Segal | Chase*7785 | 3004 | 3/8/2010 | $1,051.00 |
| Herman or Yocheved Segal | Chase*7785 | 3006 | 3/31/2010 | $ 2,458.54 |
| Herman Segal | Sig *1078 | 9066 | 6/7/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9081 | 7/7/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9096 | 8/9/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9105 | 9/7/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9107 | 10/7/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9112 | 11/8/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 9118 | 12/7/2010 | $ 1,051.00 |
| Herman Segal | Sig *1078 | 1655 | 1/19/2011 | $ 2,205.00 |
| Herman Segal | Sig *1078 | 1583 | 3/10/2011 | $ 2,152.00 |
| Herman Segal | Sig *1078 | 1732 | 7/28/2011 | $ 2,199.00 |
| Herman Segal | Sig *1078 | 1854 | 9/15/2011 | $ 1,102.00 |
| Herman Segal | Sig *1078 | 2335 | 7/10/2012 | $ 1,100.00 |
| Herman Segal | Sig *1078 | 2396 | 10/7/2012 | $ 1,540.83 |
| Herman Segal | BofA *4512 | 311 | 11/1/2012 | $ 1,540.83 |

| Herman Segal | Sig *1078 | 2203 | 12/14/2012 | $ 622.00 |
| Herman Segal | Sig *1078 | 2234 | 1/8/2013 | $ 490.83 |
| Herman Segal | Sig *1078 | 2093 | 4/11/2013 | $ 1,540.99 |
| | | | **TOTAL** | **$153,611.66** |

(the "<u>Fraudulent Transfers</u>").

120.    After the Petition Date, the Debtor made the following transfers to the Defendant:

| Transferor | Account | Check No. | Date | Amount |
|---|---|---|---|---|
| Herman Segal | BofA *4512 | | 1/28/2014 | $ 5,000.00 |
| Herman Segal | BofA *4512 | | 1/31/2014 | $ 2,133.00 |
| | | | **TOTAL** | **$7,133.00** |

(the "<u>Post-Petition Transfers</u>").


## FIRST CAUSE OF ACTION
### Constructive Fraudulent Conveyances –
### 11 U.S.C. §§ 544(a) and (b), 548(a)(1)(B) and 550,
### and N.Y. Debtor and Creditor Law §§ 273-275
### (Against Larry Grunfeld)

121.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 120 of this Complaint as if fully set forth at length herein.

122.    The Debtor had an interest in the funds and property transferred by the Fraudulent Transfers.

123.    Fraudulent Transfers in an amount not less than $7,937.48 were made by the Debtor within two (2) years of the Petition Date (the "<u>Two-Year Fraudulent Transfers</u>").

124.    All the Fraudulent Transfers were made by the Debtor within six (6) years of the Petition Date.

125.    Upon information and belief, the Debtor did not receive fair consideration or reasonably equivalent value in exchange for any of the Fraudulent Transfers.

126.    There are creditors that hold unsecured claims against the Debtor allowable under

section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made all of the Fraudulent Transfers exclusive of the Two-Year Fraudulent Transfers.

127.    At the time each of the Fraudulent Transfers was made, the Debtor was: (i) insolvent or became insolvent as a result of making such Fraudulent Transfer; and/or (ii) engaged or was about to engage in a business or transaction for which the property remaining in his hands was an unreasonably small capital; and/or (iii) intended or believed that he would incur debts beyond its ability to pay as they matured.

128.    Based upon the foregoing, the Trustee is entitled to a judgment against Defendant avoiding each of the Fraudulent Transfers as a fraudulent conveyance and directing the Defendant to return each Fraudulent Transfer or the value thereof to the Trustee.

<u>SECOND CAUSE OF ACTION</u>
**Intentional Fraudulent Conveyance –**
**11 U.S.C. §§ 544(a) and (b), 548(a)(1)(A) and 550, and N.Y. Debtor and Creditor Law § 276**
**(Against Larry Grunfeld)**

129.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 128 of this Complaint as if fully set forth at length herein.

130.    The Debtor had an interest in the funds and property transferred by the Fraudulent Transfers.

131.    The Two-Year Fraudulent Transfers were made by the Debtor within two (2) years of the Petition Date.

132.    All the Fraudulent Transfers were made by the Debtor within six (6) years of the Petition Date.

133.    The Debtor has refused to cooperate in this proceeding and has invoked his Fifth Amendment right not to testify to salient questions regarding his financial affairs, including questions about the validity and purpose of Fraudulent Transfers.

134.    At the time each of the Fraudulent Transfers was made, the Debtor was engaged in fraudulent conduct, including the solicitation of investments from individuals on fraudulent pretenses, fraudulent schemes including the purchase, sale and financing of life insurance policies, frauds against the Unites States and State of New York by the evasion and non-payment of taxes, notary fraud and/or mortgage and other frauds involving real estate.

135.    According to Annette Kleinfeld, the Debtor was/is operating "some kind of Ponzi scheme."[1]

136.    According to Arnold Young, the Debtor forged his name on loan documents and defrauded him in connection with a life insurance scam.

137.    According to the Defendant, the Debtor forged his signature on documents going back to 2004 in connection with the transfer of the Miami Coop.

138.    According to the Debtor's own testimony, he defrauded his own mother, Lilly Segal, in 2008 in connection with a mortgage placed against her residence.

139.    The Debtor has refused to testify on most topics or produce any documents in this proceeding for an alleged fear that answers to certain questions could implicate him in tax evasion and "a possibility of insider trading."[2]

140.    The Debtor made each of the Fraudulent Transfers with actual intent to hinder, delay or defraud existing and future creditors.

141.    Defendant lacked good faith in accepting the Fraudulent Transfers because the circumstances of the transfers would put a reasonable person on inquiry of the Debtor's fraudulent purpose and a diligent inquiry would have discovered the fraudulent purpose.

142.    If the Defendant performed a reasonable inquiry prior to accepting the Fraudulent

---

[1]    Kleinfeld's September 10, 2013 e-mail to the Debtor.
[2]    Transcript of September 4, 2014 evidentiary hearing on Debtor's motion to dismiss, p.67, LL.19-20.

Transfers, he would have discovered the following facts:

- the Debtor had no written business plan, prospectus, performance evaluation, or other documentation demonstrating a legitimate business enterprise;

- the Debtor had been convicted by a jury of his peers of two counts of conspiracy in the second degree in connection with the planned murder of the Debtor's late brother's father-in-law and brother-in-law (available on the internet at http://ny.findacase.com/research/wfrmDocViewer.aspx/xq/fac.19910513_0045949.NY.htm/qx);

- the Debtor was involved in litigation with his late-brother's ex-wife and her family wherein he was accused of forging the plaintiff's signature, "firing three bullets into a picture on the wall of [plaintiff's] house," and telling the plaintiff that "I'm going to end up doing crazy things like killing or taking you to court" (see Shirley Segal and Erica Amsel v. Herman Segal and Lilly Segal, 278 N.J. Super. 218, 650 A.2d 996 (1994); available on the internet at - http://leagle.com/decision/1994496278NJSuper218_1478.xml/SEGAL%20v.%20SEGAL);

- the Debtor had been involved in litigation where the genuineness of his signature was at issue (see Bell Harbor Washington Hotel, Inc., et al. v. Herman Segal, et al., Index No. 3175/2004 (N.Y. Sup. Ct. Queens Cty., June 25, 2004; decision available on the internet at https://www.nycourts.gov/library/queens/PDF_files/BelleHarborWashingtonHotel-JeffersonOmegaCorp.pdf); and

- the Debtor was disbarred by the New York State Bar Association (available on the internet at http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=5413071).

143.    Any one or more of the foregoing "red flags" put the Defendant on inquiry notice of the Debtor's fraudulent intent.  The Defendant knew or should have known of this information placing him/her/it objectively on alert that there was a problem with the Debtor's business.

144.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made all of the Fraudulent Transfers exclusive of the Two-Year Fraudulent Transfers.

145.    Based upon the foregoing, the Trustee is entitled to a judgment against Defendant avoiding each of the Fraudulent Transfers as a fraudulent conveyance and directing the Defendant to return each Fraudulent Transfer or the value thereof to the Trustee.

## THIRD CAUSE OF ACTION
### Attorneys' Fees – 11 U.S.C. §§ 544(a) and (b), and N.Y. Debtor and Creditor Law § 276-a
### (Against Larry Grunfeld)

146.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 145 of this Complaint as if fully set forth at length herein.

147.    The Fraudulent Transfers are avoidable as actual fraudulent conveyances made and received with actual intent to hinder, delay or defraud either present or future creditors of the Debtor.

148.    Based upon the foregoing, the Trustee is entitled to a judgment against the Defendant in the amount of the Trustee's actual, necessary and reasonable attorney's fees incurred in connection with the avoidance of the Fraudulent Transfers.

## FOURTH CAUSE OF ACTION
### Avoidance of Post-Petition Transfers – 11 U.S.C. §§ 549(a) and 550
### (Against Larry Grunfeld)

149.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 148 of this Complaint as if fully set forth at length herein.

150.    The Debtor's estate had an interest in the funds and property transferred by the Post-Petition Transfers.

151.    The Post-Petition Transfers occurred after the Petition Date.

152.    The Post-Petition Transfers were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

153.    Based upon the foregoing, the Trustee is entitled to a judgment against Defendant avoiding each of the Post-Petition Transfers and directing the Defendant to return each Post-Petition Transfer or the value thereof to the Trustee.

## FIFTH CAUSE OF ACTION
### Objection to Claims - 11 U.S.C. §502(d)
### (Against Larry Grunfeld)

154.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 153 of this Complaint as if fully set forth at length herein.

155.    One or more Fraudulent Transfers is avoidable as a fraudulent transfers, and/or one or more of the Post-Petition Transfers is avoidable pursuant to section 549(a) of the Bankruptcy Code (collectively, the "Avoidable Transfers").

156.    Based upon the foregoing, the Trustee is entitled to a judgment against the Defendant expunging and disallowing any claims such holders may assert against the Debtor's estate unless and until the Avoidable Transfers are returned to the Debtor's estate.

## RESERVATION OF RIGHTS

157.    The Trustee's investigation of the matters and issues raised in this Complaint have been limited to what exists in the public record, what little the Debtor shared in connection with certain hearings before this Court, the Trustee's investigation of third parties and the Trustee's review of certain documents taken involuntarily from the Debtor's electronic devices.    The Debtor has refused to cooperate and testify with respect to a vast majority of the transactions that are the subject of this proceeding.    Accordingly, the Trustee reserves his rights to amend or supplement this proceeding timely upon the discovery of additional relevant information.

**WHEREFORE**, Trustee respectfully requests that a judgment or judgments be entered against Defendant as follows:

a)    Avoiding and directing the return of the Fraudulent Transfers as fraudulent transfers;

b)    Awarding the Trustee reasonable attorneys' fees and costs in connection with obtaining the recovery of the Fraudulent Transfers;

c) Avoiding and directing the return of the Post-Petition Transfers;

d) Disallowing any claim of the Defendant unless and until all Avoidable Transfers are

returned to the estate; and

e) granting such other and further relief as this Court deems just.

Dated:   New York, New York
         September 9, 2015

                                    **KLESTADT WINTERS JURELLER**
                                    **SOUTHARD & STEVENS, LLP**


                              By:   */s/ Fred Stevens*
                                    Fred Stevens
                                    Christopher J. Reilly
                                    570 Seventh Ave., 17th Floor
                                    New York, New York 10018
                                    Tel: (212) 972-3000
                                    Fax: (212) 972-2245
                                    Email: fstevens@klestadt.com
                                         creilly@klestadt.com

                                    *Special Litigation Counsel to Plaintiff*
                                    *Richard E. O'Connell, Chapter 7 Trustee*